UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
|     *Plaintiff*, | ) | |
| | ) | |
|     *vs.* | ) | 2:10-cr-0007-JMS-CMM |
| | ) | |
| WESLEY S. HAMMOND, | ) | -01 |
| DAVID J. PITTS, | ) | -04 |
| BRADLEY S. SHELTON, | ) | -05 |
| ANTRIO D. HAMMOND, | ) | -06 |
| JWUAN MORELAND, | ) | -07 |
| JEFFREY L. DENNY, | ) | -11 |
| HERBERT PHIPPS, | ) | -14 |
| TIMOTHY BAILEY, | ) | -18 |
| SUSIE ANNETTE SMITH, | ) | -19 |
| DERRICK L. WORTHY, | ) | -20 |
| JOHN DOE, | ) | -22 |
| JACOB E. LOWE, | ) | -25 |
| DONALD ADKINS, JR. | ) | -26 |
| MICHAEL D. WEIR, | ) | -27 |
|     *Defendants.* | ) | |

**ORDER**

Presently before the Court in this criminal proceeding charging conspiracy to distribute controlled substances is Defendants' Motion to Suppress. [Dkt. 554.] The Defendants assert that they each had telephone calls intercepted pursuant to two wiretap authorizations, one entered on March 4, 2010, [2:10-mc-0008, dkt. 2]; and the other entered on March 17, 2010, [2:10-mc-00011, dkt. 2]. The Defendants contend those authorizations fail to comply with 18 U.S.C. § 2518, the federal statute governing wiretaps for criminal investigations. They have, therefore, moved to suppress the intercepted calls and the "evidence derived therefrom." *Id.* §

1

2518(10)(a).[1]   The Court held oral argument on the pending motion on January 5, 2011.

# I.
## BACKGROUND

For reasons previously explained, [*see* dkt. 637], the record for this motion to suppress is limited to the four corners of the written wiretap applications that the Government provided on March 4 and 17.  Judge Barker and Judge Lawrence, respectively, determined the applications justified wiretap authorizations.  Among other things, both applications included a highly detailed affidavit from a DEA agent, consisting of forty pages of sworn testimony for the first application, [2:10-mc-0008-SEB-WGH, dkt. 1-1], and forty-seven pages for the second application, [2:10-mc-00011-WTL-WGH, dkt. 1-1].  The Court will briefly summarize those two affidavits below, before setting forth the identically worded pertinent potions of Judge Barker's and Judge Lawrence's wiretap authorizations.[2]

**A.  The March 4 Affidavit**

The Government (in cooperation with local authorities) began a new investigation into methamphetamine trafficking in Terre Haute no later than August 2009.  At that time, the Government identified Confidential Informant ("CI") #1, who disclosed that (among others) Brad Shelton and Dustin McCombs were selling methamphetamine.  [*See* 2:10-mc-0008-SEB-WGH, dkt. 1-1 ¶¶12 *to* 14.]

---

[1]   Their motion to suppress also cites the Fourth Amendment in passing.  [*See* dkt. 554-1 at 1.]  The Defendants don't, however, contend that the Fourth Amendment provides any greater protection here than does § 2518.  Like the Defendants, the Court won't specifically undertake a Fourth-Amendment analysis.

2

CI #1 agreed to cooperate with law enforcement, which CI #1 did for the next several months. [*See id.* at ¶¶21-24, 33-37.] CI #1 debriefed law enforcement about the distribution organization, although the debriefing was limited by a lack of knowledge, among other things, about Mr. McCombs' drug supplier and about how Mr. Shelton and Mr. McCombs laundered the drug proceeds. [*Id.* ¶57(a), (e).] CI #1 also permitted law enforcement to record CI #1 on the telephone setting up a drug buy with Mr. McCombs in September 2009. [*Id.* ¶22.][3] But CI #1 ultimately decided not to go through with a controlled purchase out of an expressed fear that Jeffrey Denny, one of Mr. McCombs' associates, would find out and retaliate against CI #1. [*Id.* ¶24.]

CI #2 did, however, go through with a controlled drug buy (with the exchange of drugs and money split up over two days) from Mr. Shelton in December 2009. [*Id.* ¶¶ 33-42.] CI #2 partially set up that transaction through a phone call that CI #2 permitted law enforcement to record. [*Id.*] CI #2 also debriefed law enforcement. But CI #2's knowledge was also limited in material respects. For example, while CI #2 believed that David J. Pitts was Mr. Shelton's supplier, CI #2 didn't have any first-hand knowledge of that fact. [*Id.* ¶58(b).] And CI #2 had no knowledge, firsthand or otherwise, about Mr. McCombs' drug trafficking or how Mr. Shelton laundered drug proceeds. [*Id.* ¶¶58(a), (d).]

Beyond the use of two CIs, law enforcement invested considerable resources into its in-

---

[2] While the Court accepts as true the affidavits, the Court does so only for present purposes. The jury will have the ultimate responsibility for determining the facts of this case. Unless and until the jury finds otherwise, the Defendants are presumed not guilty of the charges against them.

[3] The Defendants don't argue that this, or any other, voluntarily recorded phone call required an order under 18 U.S.C. § 2518.

vestigation in the months before it ever requested a wiretap. It subpoenaed telephone records and began using pen registers and trap-and-trace devices on relevant phones in January 2010. [*See id.* ¶¶51, 52.] It attempted to conduct garbage searches of three relevant addresses. At one, no garbage was observed; at another, nothing of value was found; and at a third, no search was conducted because the address used a common dumpster with many others, making the garbage likely unidentifiable. [*Id.* ¶¶65-67.] Law enforcement also listened to recordings of jailhouse calls involving Mr. Pitts, from December 2009, and Mr. Shelton, in February 2010, while they were being held on state charges (before their release on bail). [*Id.* ¶¶ 25-32, 47-51.][4] It also conducted drive-by surveillance of Mr. McCombs' believed address five different times, and on Mr. Shelton's thirty times. [*Id.* ¶¶ 76, 82.] Further, law enforcement interviewed Mr. Shelton's former landlord. [*Id.* ¶80.]

Based upon its efforts, law enforcement knew that the "Pitts" organization was distributing methamphetamine in Terre Haute. [*Id.* ¶11.] But, among other things, it still didn't know "Dustin McCombs' methamphetamine source;…Brad Shelton's methamphetamine source;…all of Dustin McCombs' methamphetamine trafficking associates, including his drug runners and distributors;…the means of laundering drug proceeds used by McCombs and Shelton; and…all the locations used by the Pitts Organization to store methamphetamine and drug proceeds." [*Id.* ¶56.]

Without the ability to wiretap Mr. McCombs' and Mr. Shelton's phones, which it knew they used frequently, law enforcement believed that it wouldn't be able to fill in the gaps in its knowledge. [*See id.*] For one thing, its two CIs had only limited knowledge of the organiza-

---

[4] The Defendants don't argue that recording the jailhouse telephone calls required an order re-

4

tion. [*Id.* ¶59(a).] And because, as a security precaution, complex drug organizations take care to compartmentalize their operations—so only the highest ranking members are fully knowledgeable about all the organization's membership and activities—recruiting additional CIs would only be marginally effective. [*Id.*] Further, if law enforcement approached a new potential CI and that person refused to cooperate, law enforcement would have tipped its hand about the existence of the investigation. [*Id.* ¶59(c).]

The Government asked CI #1 and #2 about the potential effectiveness of introducing an undercover agent into the organization. [*Id.* ¶61.] Both believed that an agent couldn't gain the trust necessary to effectively penetrate the organization. [*Id.*] That skepticism comported with the expertise of the DEA affiant. [*Id.* ¶62.]

To the extent that other traditional law enforcement techniques hadn't yet been tried, the DEA affiant believed that they too would be ineffective. Grand jury subpoenas to the few known participants would likely result in invocations of the Fifth Amendment. [*Id.* ¶64.] While immunizations would avoid the Fifth Amendment problem, the government's lack of information about the organization's structure and activities might result in improvident grants of immunity: The Government might unknowingly immunize the most culpable members, preventing their prosecution. [*Id.*] Similarly, because law enforcement didn't know when the Pitts organization received their drugs, and where they were stored, law enforcement couldn't time the execution of search warrants to catch the principals red handed, receiving a drug delivery. [*Id.* ¶70.] And because the known residences of Mr. McCombs and Mr. Shelton were located in places that made undetected long-term physical surveillance difficult—for example, lacking

---

quired an order under 18 U.S.C. § 2518.

nearby businesses or hotels that could secrete surveillance vehicles—physical surveillance wouldn't be effective either. [*Id.* ¶¶76-83.]

### B. The March 17 Affidavit

The Government provided another affidavit on March 17 because it wanted to obtain two new wiretaps, based on information it had obtained from the wiretapping already undertaken pursuant to Judge Barker's March 4 wiretap authorization order.

Significantly, law enforcement asserted that what it had originally thought was the "Pitts" organization was really the "Hammond" organization, which Wesley Hammond ran through a contraband cell phone that he had managed to obtain while incarcerated in the New Castle Correctional Facility. [Dkt. 2:10-mc-00011-WTL-WGH, dkt. 1-1 at ¶18.] Law enforcement wanted to wiretap that cell phone. [*Id.* ¶10(s).] It also wanted to tap a phone that it had discovered belonged to Mr. Pitts. [*Id.* ¶10(c).]

The March 17 affidavit summarized several phone calls to establish probable cause for the expanded wiretaps—a showing that isn't ultimately at issue here, as noted below. But two pieces of information contained in those calls are especially relevant. On March 5, a participant in one wiretapped call expressed concern about a "'blue undercover cop car' that had driven past her house again." [*Id.* ¶21.] That car had indeed been conducting drive-by surveillance on the house as part of law enforcement's investigation into the what was originally thought to be the Pitts organization. [*Id.* ¶20.] The same thing happened on March 8: A participant in a wiretapped phone call said "that he wanted to 'see what this truck is doing…this truck is freaking me out.'" [*Id.* ¶39 (original ellipsis and quoting telephone call).] Law enforcement had been conducting roving surveillance of the address, but decided to stop after hearing the wiretapped con-

versation. [*Id.* ¶38.]

### C. The Wiretap Authorizations

For present purposes, the key portion of the two wiretap authorizations is their identically worded finding that "it has been established that normal investigative procedures have been tried and have failed, reasonably appear to be unlikely to succeed if tried, or are too dangerous to employ." [2:10-mc-00008-SEB-WGH, dkt. 2 ¶c; 2:10-mc-00011-WTL-WGH, dkt. 2 ¶c.]

## II.
### DISCUSSION

Although 18 U.S.C. § 2518 provides three bases to suppress a wiretap (and its fruits) only two are relevant here: if the form of the wiretap authorization is invalid and if the order was founded upon a wiretap application that failed to meet the statutory prerequisites for a wiretap. 18 U.S.C. § 2518(10)(a)(i)-(ii).[5]

### A. The Form of the Authorization Orders

Defendants first seek suppression on the ground that the two authorization orders are "insufficient on [their] face" to legally permit wiretaps. 18 U.S.C. 2518(10)(a)(ii). Citing *United States v. Castillo-Garcia*, 117 F.3d 1179 (10th Cir. 1997), and its prohibition in wiretap applications against "generalities, or statements in the conclusory language of [18 U.S.C. § 2518]," *id.* at 1188, the Defendants claim that the two authorization orders are defective because

---

[5]  In their motion, Defendants additionally allege that the wiretaps failed to follow the minimization components of the wiretap orders and should also be suppressed on that basis. *Compare* 18 U.S.C. § 2518(10)(a)(iii) (permitting suppression where "the interception was not made in conformity with the order of authorization or approval"), *with* [dkt. 554-1 at 16.] Because the Court has already held that the government has presented prima facie evidence that it complied with the minimization requirement, [dkt. 599], and because the Defendants didn't seek to press their failure-to-minimize argument in their reply or at oral argument, [*see* dkt. 631], the Court will consider it abandoned, and will rest on its earlier determination of compliance.

7

the orders merely track the statutory language rather than setting forth detailed findings applicable to the circumstances of this case. [Dkt. 554-1 at 4.] Indeed, Defendants complain that the authorization orders recite by "rote" the statutory standards in the disjunctive, so the Defendants (and by implication, the Court) don't know even which standards the issuing judges found had been satisfied. [*Id.*] In their view, more is required to permit effective judicial review of the wiretap orders.

The Seventh Circuit hasn't yet had occasion to consider the level of detail necessary in a wiretap order. With all due respect to the Tenth Circuit, the Court does not, however, anticipate that the Seventh Circuit would follow *Castillo-Garcia* here.

First, while 18 U.S.C. § 2518(4) requires a wiretap authorization to "specify" many things—including, for example, "the particular offense to which [the communication to be intercepted] relates, *id.* § 2518(4)(c)—Defendants have pointed to no text in the statute that mandates specific and detailed findings about the need for a wiretap in the authorization. If Congress wanted to require findings about necessity, it would have done so explicitly. *See United States v. Soto-Nava*, 2002 U.S. Dist. LEXIS 4593, *10-11 (S.D. Ind. 2002) (Hamilton, J.) (rejecting *Castillo-Garcia* because "[w]hat is required by the statute is a determination that the statutory standard has been met, not the sort of detailed factual findings required under Rule 52 of the Federal Rules of Civil Procedure").

Second, if courts had to make detailed findings, the Government would have to wait until courts could prepare them, a delay that might be substantial in especially busy districts like this one, *see* http://www.uscourts.gov/viewer.aspx?doc=/cgi-bin/cmsd2009.pl (last visited January 10, 2011) (listing this District as having the nation's sixteenth highest weighted caseload per

judge). Valuable information might needlessly be lost in investigations in which probable cause necessarily exists "that an individual is committing, has committed, or is about to commit" a wiretap-eligible offense. 18 U.S.C. § 2518(3)(a).[6]

Finally, with respect to this case in particular, if it were error to have issued a wiretap authorization without having recited detailed factual findings regarding necessity, any error in that regard would have been harmless. In this Court's view, and as will be discussed below, existing Seventh Circuit authority makes the affidavits presented to Judge Barker and Judge Lawrence so compelling as to have rendered any denial of a wiretap reversible error. *See* 18 U.S.C. § 2518(10)(b) (permitting the government an appeal as of right from a denial of a wiretap application); *United States v. Donovan*, 429 U.S. 413, 436 n.23 (1977) (suggesting that a failure to identify all individuals whose incriminating conversations might be overheard in the wiretap application submitted for court approval isn't grounds for suppression absent bad faith or prejudice to the defendant).[7]

The Court thus rejects the Defendants' challenge to the form of the wiretap orders.

**B. The Merits of the Authorization Orders**

Defendants also contend that the wiretap authorizations wrongly concluded that the Government had met its evidentiary burden necessary to obtain a wiretap, thereby making each of the calls here suppressible as "unlawfully intercepted," 18 U.S.C. § 2518(10)(a)(i). Specifically, they claim that nothing in the applications establishes, as required, necessity: that non-wiretap

---

[6] The Defendants do not challenge the probable-cause determinations in the wiretap orders.

[7] So, even if the Court didn't have to "giv[e] substantial deference to the [necessity] determination of the issuing judge," *United States v. Zambrana*, 841 F.2d 1320, 1329-1330 (7th Cir. 1988) (citations omitted), the Court would still deny the motion to suppress.

investigative procedures "have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(3)(c).

Congress' purpose in conditioning wiretaps upon a showing of necessity was narrow. Congress wanted "to ensure not that wiretaps are used only as a last resort in an investigation, but that they were not to be routinely employed as the initial step in criminal investigation." *United States v. Thompson*, 944 F.2d 1331, 1340 (7th Cir. 1991) (quotation omitted). Thus, the Seventh Circuit has long held that the necessity hurdle "is not great," and that necessity claims must be viewed "in a practical and commonsense fashion." *United States v. Anderson*, 542 F.2d 428, 431 (7th Cir. 1976) (quotations omitted); *accord United States v. McLee*, 436 F.3d 751, 763 (7th Cir. 2006). Indeed, the Government can establish necessity even without actually trying other investigative measures. *United States v. Zambrana*, 841 F.2d 1320, 1329 (7th Cir. 1988) ("[T]he statute does not require that other investigative procedures actually be implemented before an order may be issued for the interception of wire communications…."). And it can establish necessity for a wiretap when an indictment and even a full prosecution are at least theoretically possible based upon information it already possesses. *See McLee*, 436 F.3d at 763 ("To receive a wiretap order, the government need not demonstrate that prosecution would be impossible without it or that evidence possibly sufficient for indictment could not conceivably be obtained through other means." (citation omitted)). So low is the necessity hurdle that Defendants have been unable to cite to a single district or appellate case within this Circuit justifying suppression on that ground. Among the many circumstances that the Seventh Circuit has held constitute necessity are that investigators were having difficulty "ascertain[ing] the extent and structure of the conspiracy," *United States v. Plescia*, 48 F.3d 1452, 1463 (7th Cir. 1995); and

10

that "undercover agents and cooperating witnesses" would be exposed to "possible danger" and were otherwise having difficulty conducting undercover surveillance, *United States v. Farmer*, 924 F.2d 647, 652 (7th Cir. 1991).

At oral argument, Defendants argued at length that 18 U.S.C. § 2518 prevents the Government from obtaining a wiretap until it has made a "reasonable effort at normal investigative procedures both in terms of the quantity of the procedures to be employed and in the quality of the investigation."[8] Assuming without deciding that Defendants' interpretation of the necessity requirement comports with Seventh Circuit precedent, the Court finds that the affidavits presented to Judge Barker and Judge Lawrence easily satisfy Defendants' proposed standard.

In their attempt to cast the Government as having rushed to wiretaps to avoid normal investigatory effort—despite the months of investigation and limited results that pre-dated the first wiretap application—the Defendants chiefly complain that the Government didn't do more to develop more confidential informants. In their view, because the Government had had some success with CI #1 and CI #2, it should have continued to cultivate other confidential informants. In that regard, the Defendants note that several of them, as well as several co-Defendants who have pleaded guilty, were arrested on various state charges between July 2009 and February 2010. [*See* dkt. 554-1 at 10 *to* 12.] Had the Government only approached them and attempted to convert those arrested individuals into confidential informants or cooperating witnesses, the Defendants speculate, the Government could have gained valuable information for its investigation and avoided the need for a wiretap.

---

8   No party has ordered the transcript of the oral argument, so it has not been docketed.

The Court rejects the Defendants' claim that the Government should be faulted for not cultivating more confidential informants. As Defendants themselves concede, "they are unable to locate controlling case authority in the Seventh Circuit for the proposition that the government is required to make a good faith effort to recruit or attempt to recruit confidential informants prior to filing an application for a wiretap." [Dkt. 648 at 2 (emphasis removed).] If any such requirement exists, the Government satisfied that obligation by recruiting CI #1 and CI #2 and by presenting evidence that the utility of further confidential informants would be limited by the compartmentalized nature of the alleged Pitts-then-Hammond drug organization. *Zambrana*, 841 F.2d at 1329 (not requiring that particular investigative techniques be used if the government explains why they aren't likely to succeed). While the Government might have offered sweetheart deals to the moving Defendants who had been arrested before March 2010 to entice them to cooperate, any attempt here to conclude that they either could or would actually have provided any valuable information to the Government conflicts with the complete presumption of innocence that those Defendants still enjoy.[9] To the extent that the moving Defendants contend that the Government could have flipped co-Defendant Megan Samuels (who entered a plea of guilty) or any other person, the Defendants have failed to acknowledge the risk that an unsuccessful recruitment would pose to the Government's investigation. In the absence of any claim of bad faith—as opposed to mere insufficient action, as is incorrectly claimed here—the Court presumes that the Government acts rationally. *Cf. DiLeo v. Ernst & Young*, 901 F.2d 624, 629 (7th Cir. 1990) ("One who believes that another has behaved irrationally has to make a strong case."

---

[9] Even if the Court could find that some of the moving Defendants had useful information without violating their presumption of innocence, those Defendants could have volunteered that information while in state custody—but chose not do so.

(citations omitted)). The Court will not second guess the Government's strategy when it comes to enticing cooperation and/or any underlying assessment as to relative culpability that may be inherent therein.

The Government might have spent more time conducting drive-by surveillance, pouring over telephone records, or waiting until an undercover agent could gain sufficient trust to penetrate alleged drug organization and thereby finally "ascertain the extent and structure of the conspiracy," *Plescia*, 48 F.3d at 1463. But doing so may have permitted the Defendants who have already pleaded guilty to distribute more illegal drugs in Indiana, despite Congress' determination that illegal drugs are gravely injurious to the public health. Furthermore, because later wiretaps reveal that some members of the alleged organization had become rightly suspicious about the possibility of Government surveillance, continuing to rely on relatively ineffective investigatory methods ran the risk that the entire organization might interrupt its operation, preventing or significantly inhibiting prosecution of its members. Given the relatively low bar that necessity requirement poses for law enforcement in the Seventh Circuit, the Court finds that the Government's wiretap applications easily cleared it. The affidavits more than provided a sufficient "factual predicate," *Anderson*, 542 F.2d at 431 (quotation omitted), to conclude (1) that prior investigative procedures were tried but failed to establish the extent and structure of the alleged conspiracy and (2) that additional non-wiretap procedures reasonably appeared to be un-

likely to succeed if tried.[10]

There is one final matter relating to the March 17 wiretap application. The Defendants briefly argue that because the March 17 application was a request to extend Judge Barker's order, in addition to a request to conduct two new wiretaps, [*see* 2:10-mc-00011-WTL-WGH, dkt. 1 at 6 *to* 7], the application was obligated to provide "a statement setting forth the results thus far obtained from the interception, or a reasonable explanation of the failure to obtain such results," 18 U.S.C. § 2518(1)(f). [Dkt. 554-1 at 16.] While Defendants say that "the March 17 Application does not contain an adequate description of that evidence, nor does it indicate how or why that evidence is insufficient to fulfill the objectives of the investigation," [*id.*], they fail to specify what, exactly, they contend the Government wrongly left out. The March 17 Affidavit summarized enough wiretaps for Judge Lawrence to find probable cause—and Defendants do not challenge that finding—to believe that Wesley Hammond and others not mentioned in the March 4 Affidavit were conspiring to distribute illegal drugs. Absent more cogent argument about what the Government should have included but didn't, the Court finds that this objection to the March 17 wiretap application is waived. *See In re Aimster Copyright Litig.*, 334 F.3d 643, 656 (7th Cir. 2003) (under-developed arguments are waived).

### III.
#### CONCLUSION

Defendants' motion to suppress asks the Court to require the Government to undertake a

---

[10] At oral argument, the Defendants also argued that the failure to recount a specific threat of physical violence against CI #1 precluded a finding that normal investigative methods would have been too dangerous to try. Whether or not CI #1's fear was reasonable, the Government argued that CI #1's refusal to complete the transaction showed the inefficacy of normal investigative procedures. Given the abundant evidence in that regard, which already establishes the

14

level of investigation beyond that required by controlling Seventh Circuit precedent before seeking a wiretap authorization. The Court will not impose such a standard. At a minimum, the applications in question here established (1) that prior investigative procedures were tried and failed to establish the extent and structure of the alleged conspiracy and (2) that additional non-wiretap procedures reasonably appeared to be unlikely to succeed if tried. That showing made the wiretaps proper. Defendants' motion to suppress, [dkt. 554], is therefore **DENIED**.

01/18/2011

_____
Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

**Copies to all counsel of record electronically registered.**

---

propriety of the wiretaps, the Court need not and will not specifically consider whether the "danger" criterion is also satisfied.